ATTORNEYS FOR APPELLANT
Jill S. Swope
Sterba & Swope, LLP
Schererville, Indiana

Julia Blackwell Gelinas
Abigail T. Rom
Margaret Lee Smith
Frost Brown Todd, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Debra Lynch Dubovich
Levy & Dubovich
Merrillville, Indiana

John M. Rhame, III
Rhame & Elwood
Portage, Indiana



FILED

Mar 15 2016, 10:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 45S04-1512-DR-00682

IN RE THE MARRIAGE OF

AMY STEELE-GIRI,

*Appellant (Respondent below),*

v.

BRIAN K. STEELE,

*Appellee (Petitioner below).*

Appeal from the Lake Superior Court, No. 45D03-0606-DR-00617
The Honorable Elizabeth F. Tavitas, Judge
The Honorable Nanette K. Raduenz, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 45A04-1412-DR-00600

**March 15, 2016**

**David, Justice.**

1

**Facts and Procedural History**

Brian Steele ("Father") and Amy Steele-Giri ("Mother") divorced in 2007. They have one minor child, J.S., who was two (2) years old at the time of the divorce. Initially, the parties had joint legal and physical custody of J.S. Thereafter, Mother planned to move to California to be with her now-husband, Dr. Giri. At that time, Father had been cohabiting with his girlfriend, Brenda Guth, for the previous two (2) years. By agreement of the parties and based on the appointed guardian ad litem's (GAL) report, the trial court granted an agreed order giving primary physical custody to Father. In the GAL's report, she stated that Father had a flexible work schedule and that Ms. Guth was a stay-at-home mother. Mother was granted liberal parenting time including visits every four (4) to six (6) weeks, as well as visits during spring break, summer, and anytime she was in Indiana upon giving Father 48 hours' notice. The parties continued to share joint legal custody.

Since the initial custody modification, several changes have occurred in both households. Mother and her new husband, Dr. Giri, had a son, a half-brother to J.S. Additionally, Dr. Giri took a ten (10) year contract position in Oregon. Mother and her family moved to Oregon, and Mother became a stay-at-home mom. Father changed jobs from one that had flexible hours to a new job where he had to work 12 hours shifts. Around the same time, Father's girlfriend, Ms. Guth, started full-time work at a local school and thus, was no longer a stay-at-home mom. Because of these schedule changes, J.S. was enrolled in both before and after school care. Father did not initially tell Mother about these changes. Childcare records reflect that J.S. was dropped off at before school care in the morning between 7:10 and 7:30 a.m. and then after school, she was transported by bus to after school care at the Boys & Girls Club, where she remained until she was picked up in the evenings. The pick-up times varied. There were several occasions where J.S. remained in after school care until approximately 8:00 p.m or later. Father testified that J.S. enjoys her time at the Boys & Girls Club, she has friends there and she engages in activities such as soccer, crafts and dances there. On occasion, J.S. has requested to stay there later.

Since beginning elementary school, J.S. has experienced some academic difficulties. Her school sent home letters indicating that she was either recommended to or required to attend

2

summer school after both 1st and 2nd grades. Father did not advise Mother of the summer school recommendation and requirement, nor did he enroll J.S. in summer school. Mother was further removed from decision-making regarding J.S.'s education because her contact information was not initially included in J.S.'s school registration form. Also, while J.S. has passed the ISTEP test, she has struggled and needed extra help. However, despite J.S.'s initial struggles in school, her third grade teacher reported to the GAL that she is pleased with J.S.'s academic progress and that J.S. works very hard. J.S.'s academic performance has improved each year.

Ms. Guth has two children from a prior relationship that live in the home with her and Father. While with Father, J.S. shares a room with Ms. Guth's daughter, M.G., who is approximately 4 years older than J.S. J.S. has struggled to get along with M.G. Mother reported to the GAL that M.G. fights with and shoves J.S. However, Father has characterized the relationship between the girls as a sibling rivalry and indicated that their arguments were "normal kids' stuff." (App. at 63.) The GAL also put in her report and testified that there had been some improvement in the girls' relationship. Also, Father has remodeled the girls' room so that each of them could have some privacy.

Based on the changed circumstances of both parents, Mother filed a verified petition for modification of custody and a verified motion for rule to show cause why Father should not be held in contempt for not complying with the Court's legal custody order. The GAL interviewed all the parties and filed a report wherein she stated that she felt like there were no objective witnesses she could rely upon and that she believed that both parents had attempted to influence J.S.'s reports and comments to her. She therefore declined to make a formal recommendation regarding which parent should be granted physical custody. She did, however, note concerns about the amount of time J.S. spent in the care of someone other than her Father, as well as concerns that J.S. was having to share a room with M.G., with whom she has "not been able to happily coincide, for all these years." (App. at 79.) The GAL stated that the opportunity for J.S. to live with Mother was "appealing" and that she believes it would be nice if J.S. could have an opportunity to live with Mother in Oregon to see if J.S. "flourished in that setting." (App. at 80-81.) She also stated that Father is a wonderful dad and that J.S. enjoys a close relationship with

3

her paternal grandparents. She stated that J.S is "blessed to have two (2) parents who love and adore her" and that J.S. could not choose between them. (App. at 81.)

The trial court entered findings of fact and conclusions of law *sua sponte* and denied both Mother's request for modification of custody and motion for rule to show cause (contempt). Mother appealed. The Court of Appeals majority reversed the trial court on both issues. Steele-Giri v. Steele, 40 N.E.3d 513 (Ind. Ct. App. 2015). As for the custody issue, the Court of Appeals majority determined that some of the trial court findings were erroneous. Specifically, the Court of Appeals found that the trial court's finding characterizing J.S.'s relationship with M.G. as merely a sibling rivalry and the finding that J.S. was well-adjusted to school were erroneous. Id. at 522-523. The Court of Appeals also concluded that the trial court generally applied an erroneous standard in that it focused solely on Father's situation in making its determination, instead of looking at the changes to both households and the impact on the child. Id. at 524. It also found that Father was in contempt for making unilateral decisions about J.S.'s education and by not sharing information with Mother. Id. 527-528. Judge Barnes dissented, concluding that while the evidence could have supported a custody modification, it did not compel that result. Id. at 529 (Barnes, J., dissenting).

Mother filed a motion for immediate compliance with the Court of Appeals opinion, and the Court of Appeals issued an order transferring physical custody of J.S. to Mother in Oregon. J.S. has been living with Mother in Oregon since that time. Father sought transfer, which we granted after hearing oral argument. Steele-Giri v. Steele, 41 N.E.3d 690 (Ind. 2015) (Table). We vacated the Court of Appeals' opinion and the order transferring custody to Mother. Indiana Appellate Rule 58(A); (Order Granting Transfer, December 14, 2015). We further ordered Mother to transfer physical custody back to Father during J.S.'s winter break from school. (Order Granting Transfer, December 14, 2015.)

We hold that the trial court did not err in denying Mother's motions for custody modification and for contempt. In light of the highly deferential standard of review afforded to trial courts in family law matters and in contempt matters, the Court of Appeals should have

4

affirmed the trial court. Accordingly, we affirm the trial court's denial of Mother's motions for custody modification and for contempt.

**Standard of Review**

**I.      Child Custody**

The trial court entered findings of fact and conclusion of law in its order denying modification of custody. Pursuant to Indiana Trial Rule 52(A), the reviewing court will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." D.C. v. J.A.C., 977 N.E.2d 951, 953 (Ind. 2012) (internal quotation and citations omitted). Where a trial court enters findings *sua sponte*, the appellate court reviews issues covered by the findings with a two-tiered standard of review that asks whether the evidence supports the findings, and whether the findings support the judgment. In re S.D., 2 N.E.3d 1283, 1287 (Ind. 2014) (citation omitted). Any issue not covered by the findings is reviewed under the general judgment standard, meaning a reviewing court should affirm based on any legal theory supported by the evidence. Id.

Additionally, there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." In re Marriage of Richardson, 622 N.E.2d 178 (Ind. 1993). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." Kirk v. Kirk, 770 N.E.2d 304, 307 (Ind. 2002) (quoting Brickley v. Brickley, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." Id. "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." Best v. Best, 941 N.E.2d 499, 502 (Ind. 2011) (citations omitted).

The party seeking to modify custody bears the burden of demonstrating the existing custody should be altered. Lamb v. Wenning, 600 N.E.2d 96, 98 (Ind. 1992) (citation omitted).

5

Indeed, this "more stringent standard" is required to support a change in custody, as opposed to an initial custody determinations where there is no presumption for either parent because "permanence and stability are considered best for the welfare and happiness of the child." Id. (citation omitted).

## II.      Rule to Show Cause (Indirect Contempt)

"It is soundly within the discretion of the trial court to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard." Witt v. Jay Petroleum, Inc., 964 N.E.2d 198, 202 (Ind. 2012) (citation omitted). "We will reverse a trial court's finding of contempt only if there is no evidence or inference therefrom to support the finding." Id. The trial court has the inherent power to "maintain[ ] its dignity, secur[e] obedience to its process and rules, rebuk[e] interference with the conduct of business, and punish[ ] unseemly behavior." Id.

## Discussion

## I.      Child Custody

Indiana Code § 31-17-2-21 provides that a trial court "may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Ind. Code § 31-17-2-8]. . ." Ind. Code § 31-17-2-8 provides that the trial court is to consider all relevant factors, including:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>       (A) the child's parent or parents;
>       (B) the child's sibling; and
>       (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
>       (A) home;

6

(B) school; and
(C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian. . .

A child custody determination is very fact-sensitive. In this case, the trial court listened to evidence over the course of two days. It heard testimony from Father, Mother, Ms. Guth, Dr. Giri and the GAL. The parties presented documentary evidence such as J.S.'s school and child care records and Father's work records. The trial court examined each of the factors listed above, considered the changes in both households and determined that it was in J.S's best interests that custody not be modified. Nevertheless, the Court of Appeals determined that two (2) of the trial court's findings were erroneous and that there was a substantial change of circumstances warranting a custody modification. However, there was evidence in the record to support each of the trial court's factual findings such that they were not clearly erroneous. Additionally, even assuming that these two (2) factual findings were erroneous, there is still ample evidence in the record to support a determination that a custody modification is not in J.S.'s best interests.

## A.     The trial court's factual findings were not clearly erroneous.

"Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them." In re Paternity of Winkler, 725 N.E.2d 124, 126 (Ind. Ct. App. 2000) (citation omitted). Here, while there may be conflicting evidence about: 1) the relationship between J.S. and M.G.; and 2) J.S.'s adjustment to school, there is nevertheless evidence in the record that would support these trial court findings. We will address each of these findings in turn.

## 1.     Relationship between J.S. and M.G.

With regard to J.S.'s interaction and interrelationship with her Father, Ms. Guth and Ms. Guth's children, the trial court found:

7

Father has had a long term relationship with his live in girlfriend, Brenda Guth. They have lived together for nine years. Brenda's two children, [A.G.], 16 years old, and [M.G], 14 years old, also live at the residence with Father and [J.S.] It is undisputed that [M.G.] and [J.S.] fight "like sisters." There was no evidence that the fighting was anything more than sibling rivalry. There was no evidence of physical violence between the girls. There was no evidence that Father or Brenda played favorites with either child. The girls share a bedroom. Father and Brenda have taken extra steps to ensure that both girls have their private space to the best of their ability. [J.S.] has a good relationship with Ms. Guth and [A.G.]

(App. at 19.)

There is conflicting evidence in the record regarding J.S.'s relationship with M.G. On the one hand, J.S. has struggled to get along with M.G. Mother reported to the GAL that M.G. fights with and shoves J.S. The GAL noted her own concerns about J.S.'s relationship with M.G.: "It also troubles me that at [Father's] house [J.S.] has been forced to share a bedroom with [M.G.], with whom she has not been able to happily coincide, for all these years." (App. at 79.) However, the GAL qualified her statement by stating she "would never suggest that a child be placed [in Mother's home] because there is more money available." (Id.) On the other hand, Father has characterized the relationship between the girls as a sibling rivalry and indicated that their arguments were "normal kids' stuff." (App. at 63.) Additionally, the GAL noted in her report and testified that there had been some improvement in the girls' relationship.

Mother disagrees with these factual findings, specifically the characterization of the fighting between J.S. and M.G. as a "sibling rivalry" and the statement that there is "no evidence of physical violence." (App. at 19.) However, the trial court heard the testimony of the parties and reviewed the GAL's report. It was within the trial court's discretion to credit Father's characterization of the relationship between J.S. and M.G. as a sibling rivalry. Father has had the opportunity to observe the relationship between the girls on a regular basis. There was also evidence that the relationship between the girls was improving. Accordingly, we find that the trial court's determination that the relationship between J.S. and M.G. is akin to a sibling rivalry is not clearly erroneous as there is a factual basis for this finding.

8

The trial court finding that there is "no evidence of physical violence between the girls" may be a bit strong in light of evidence that Mother reported to the GAL that she feels M.G. shoves J.S. However, there are no details or specifics about this shoving in the record and curiously, Mother did not testify regarding the alleged shoving during the trial court proceeding. It was within the trial court's discretion to discredit this second-hand report of alleged shoving. While perhaps not precisely drafted, the trial court's finding that there was no physical violence between J.S. and M.G. is not clearly erroneous.

## 2. J.S.'s adjustment to school.

With regard to J.S.'s adjustment to school the trial court found:

> Since the entry of the last order, [J.S.] has adjusted well to school
> and the community where her Father lives. . .

(App. at 19.)

There is also mixed evidence in the record about J.S.'s adjustment to school. It is undisputed that beginning in elementary school, J.S experienced some academic difficulties. Her school sent home letters indicating that J.S. was either recommended to or required to attend summer school after both 1st and 2nd grades. Also, while J.S. has passed the ISTEP test, she has struggled and needed extra help. However, despite J.S.'s initial struggles in school, her third grade teacher reported to the GAL that she is pleased with J.S.'s academic progress, and that J.S. works very hard. Also, J.S.'s academic performance has improved each year.

Despite this conflicting evidence regarding J.S.'s school performance, the Court of Appeals majority determined that the trial court finding that J.S. was well adjusted to school was erroneous, adopting Mother's position that J.S. "is denied an opportunity to reach her full academic potential," and further that "J.S.'s academic skills are not aided by the enormous amounts of time that J.S. spends in daycare." Steele, 40 N.E.3d at 522.

9

However, for a finding to be clearly erroneous, there must be no evidence to support it. See In re Paternity of Winkler, 725 N.E.2d at 126. Here, although there is evidence that J.S. struggled in school, there is also evidence that J.S.'s performance was improving and that her teacher was pleased with her progress. Because there is evidence to support the finding that J.S. is well adjusted to her school, this finding is not clearly erroneous.

Also, as Father points out, the trial court made two separate findings with regard to J.S.'s schooling. The first is quoted above. There is another related finding that provides in relevant part:

> . . . There is no evidence to support Mother's contention that [J.S.] is under-performing at school. . . It is possible that Mother could help [J.S.] raise her grades. The [c]ourt finds that Father is equally concerned with the child's performance and is working with the teachers and school officials to help the child with her studies. The [c]ourt finds that Father is not neglecting or endangering the child by allowing her to stay at the day care. . .

(App. at 20.) This finding was not contested by Mother nor found to be erroneous by the Court of Appeals majority. Father argues that while the first finding is related to J.S.'s *adjustment* to school, the latter relates to her *performance*. He further argues that if adjustment means J.S.'s relationship with her teachers and other students, then the finding is not clearly erroneous and supports the trial court's order. Finally, he argues that even if performance in school and adjustment to school are one in the same, because there is conflicting evidence on this issue, the trial court's findings should not be disturbed.

We agree with Father. The trial court made a finding about J.S.'s adjustment to her school and community and then, in a separate but related finding, acknowledged concerns about J.S.'s school performance. It also noted each parent's ability and efforts to address J.S.'s academic performance and assist her with her studies. There is no evidence that J.S. struggled to get along with her teacher or other students. Thus, if adjustment to school means J.S.'s relationships within the school environment, the finding that she is well adjusted to school is not clearly erroneous. On the other hand, even if J.S.'s school performance does factor into her

10

adjustment to school, because there is at least some evidence to support that finding, it is still not erroneous.

**B.     The trial court's finding that modification of custody is not in J.S.'s best interests is supported by the record**.

As discussed above, in order for the trial court to modify custody, it must find *both* that: 1) modification is in the best interests of the child; and 2) there is a substantial change in one or more of the factors enumerated in the custody modification statute.  Ind. Code § 31-17-2-21. Here, the trial court found that it was in J.S.'s best interests that custody not be modified and that there were no significant changes in *Father's* situation that would justify a custody modification. The trial court order provides:

> [A]lthough Mother's situation might be better now, there has been no significant change in circumstance in Father's situation that would justify a modification of custody.

(App at 20-21.)

As Mother points out, a change in circumstances "must be judged in the context of the whole environment, and the effect on the child is what renders a change substantial or inconsequential."  Jarrell v. Jarrell, 5 N.E.3d 1186, 1193 (Ind. Ct. App. 2014), transfer denied (internal quotation and citation omitted).  Here, while the trial court order stated that there was "no significant change in circumstance in Father's situation that would justify a modification of custody" and did not make an explicit conclusion about Mother's circumstances, in its order, it did acknowledge the significant changes in Mother's household that would necessarily impact J.S. (App. at 20-21.)  For example, the trial court found that Mother had gotten married and had another child, a sibling to J.S., and that Mother had become a stay-at-home mom. Notwithstanding the changes in *both* households, the trial court did not find that a custody modification was warranted.  The trial court was in the best position to determine the impact of all the changes on J.S.

When considering a custody change a "more stringent standard" is required than for an initial custody determination because "permanence and stability are considered best for the

welfare and happiness of the child." Lamb, 600 N.E.2d at 97 (citations omitted). Again, the party seeking to modify custody bears the burden of demonstrating the existing custody should be altered. Kirk, 770 N.E.2d at 307. Thus, it makes sense that the trial court would place emphasis on the Father's circumstances. Nevertheless, even if we were to find that the changes in the parties' circumances were substantial, this alone does not warrant a custody modification; the best interests of J.S. must be considered.

There was ample evidence for the trial court to conclude that a custody modification was not in J.S.'s best interests. The trial court found that:

> [d]ue to Father's work schedule, he would not have additional time available, nor the financial ability, to travel to Oregon on a regular basis to visit [J..S.] should custody be changed. The [c]ourt finds that a change in physical custody would significantly decrease Father's parenting time with [J.S.] The [c]ourt further finds that such reduction in the time spent with her father, is not in the child's best interest.

(App. at 21.) The trial court further found that Mother did have the ability to travel and that she would continue to be able to enjoy regular parenting time with J.S., even if Father retained custody. The trial court also noted J.S.'s "especially close" relationship with her paternal grandparents. (App. at 19.) These findings are supported by the record. For instance, in the GAL's report she stated that J.S. "adores her father" and that her "close relationship with her paternal grandparents is a point against moving to Oregon." (App. at 80.) The GAL also noted that Father has to work long hours and that he and his parents were concerned about not being able to see J.S. if she were to move to Oregon. Thus, notwithstanding whether the changes in the parents' households were substantial and whether the trial court's findings with regard to: 1) J.S.'s relationship with M.G.; and 2) her adjustment to school were erroneous (they were not), in order to modify custody, the trial court had to find that doing so was in J.S.'s best interests. In light of the negative impact a custodial change would have on J.S.'s relationship with her Father and paternal grandparents, the trial court found that it was not in J.S.'s best interests for custody to be modified. This finding is supported by the record and must be affirmed.

12

## II.    Contempt

A person who is guilty of any willful disobedience of any process, or any order lawfully issued:

> (1) by any court of record, or by the proper officer of the court;
> (2) under the authority of law, or the direction of the court; and
> (3) after the process or order has been served upon the person;
>
> is guilty of an indirect contempt of the court that issued the process or order.

Ind. Code § 34-47-3-1.

The parties have joint legal custody of J.S.  Pursuant to Ind. Code § 31-9-2-67, the parties must share "authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training."  Mother argues that Father is in contempt of the court's order giving the parties joint legal custody by not keeping her informed about J.S's summer school recommendations, J.S.'s report cards and J.S.'s before and after school care.  She also faults Father for failing to include her information on school and child care records and denying her parenting time when she was in Indiana on two occasions.

The trial court found that Father did not willfully fail to comply with the joint legal custody order.  Instead, the trial court found that where information is available to Mother directly from the school, Father cannot be said to be in willful violation of the order.  Also, the trial court found that Father believed information was being passed from J.S. to her Mother (albeit wrongfully). Noting communication problems with *both* parents, the trial court admonished both parties to communicate directly with each other.  The trial court also found that the 48 hour time-frame for Mother to notify Father that she intended to exercise visitation was too short, such that it caused conflict in the parties' schedules.  Thus, it revised the custody order to allow for more advance notice to Father when Mother planned to visit Indiana and exercise parenting time.

13

The Court of Appeals reversed the trial court and found that Father made a unilateral decision not to enroll J.S. in summer school and that he otherwise passive-aggressively did not inform Mother about J.S.'s academic performance and child care situation as a way to exclude her participation in J.S.'s upbringing. Steele, 40 N.E.3d at 527-528. It found that the trial court order was against the logic and effect of the facts and circumstances and that allowing Father to willfully ignore court orders would "incentivize Father to continue on the trodden path." Id. at 529.

Like with the custody determination, trial courts are given great deference in contempt actions. Witt, 964 N.E.2d at 202 (citations omitted). "Crucial to the determination of contempt is the evaluation of a person's state of mind, that is, whether the alleged contemptuous conduct was done willfully." Id. Here, the trial court found that Father's conduct was not willful. It was in the best position to weigh the evidence and assess Father's credibility. There was evidence in the record from which the trial court could determine that Father's conduct was not willful. For instance, the GAL testified that she was not sure that Father saw some of the correspondence from the school that Mother complained Father never provided to her. Also, Father testified that he believed Mother had access to J.S.'s school records online and that Mother had told him she was receiving notices from the school. The Court of Appeals should not have substituted its judgment about whether Father's conduct was willful for that of the trial court. The trial court did not abuse its discretion in denying Mother's motion for contempt.

**Conclusion**

As we noted above, we give substantial deference to trial court judges in family law matters. "On appeal it is not enough that the evidence *might* support some other conclusion, but it must positively *require* the conclusion contended for by appellant before there is a basis for reversal." Kirk, 770 N.E.2d at 307 (emphasis added) (footnote omitted). Here, while the evidence *might* have supported Mother's motion for custody modification, such modification was not *required*. There was ample evidence to support the trial court's determination that a custody modification was not in J.S.'s best interests. Similarly, in light of the highly deferential standard of review for contempt matters and the fact that there was evidence from which the trial court could determine that Father's failure to abide by the court's legal custody order was not

14

willful, the Court of Appeals should have deferred to the trial court on this issue as well. Accordingly, we affirm the trial court's denial of Mother's motion for custody modification and motion for contempt.

Rush, C.J., Dickson, Rucker and Massa, J. J., concur.